1 **JODI DENISE THORP**
California State Bar No. 223663
2 427 C Street, Ste. 300
San Diego, California 92101-5008
3 Telephone: (619) 233-3169
jodithorp@thorplawoffice.com
4

5 Attorneys for Mr. Barajas-Cruz

6

7

8                   UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE LARRY A. BURNS)**

11 UNITED STATES OF AMERICA,          )   Case No.:  08CR0019-LAB
                                       )
12            Plaintiff,               )   Date:    January 22, 2008
                                       )   Time:    2:00 p.m.
13 v.                                  )
                                       )
14 SALVADOR BARAJAS-CRUZ,              )   **STATEMENT OF FACTS AND POINTS AND**
                                       )   **AUTHORITIES IN SUPPORT OF MOTIONS**
15            Defendant.               )
                                       )
16 _____

17                              **I.**
                       **STATEMENT OF FACTS**
18

19      On January 2, 2008, the January 2007 Grand Jury panel issued an indictment charging Mr. Barajas-

20 Cruz with violating 21 U.S.C. §§ 952 and 960, importation of marijuana, and 21 U.S.C. § 841(a)(1),

21 possession of marijuana with the intent to distribute.  He pled not guilty to these charges.

22                              **II.**
   **THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE 21 U.S.C. §§ 841 AND 960**
23 **ARE FACIALLY UNCONSTITUTIONAL; ALTERNATIVELY, THE COURT SHOULD**
   **REQUIRE THE GOVERNMENT TO PROVE MR. BARAJAS-CRUZ KNEW THE QUANTITY**
24 **AND TYPE OF CONTROLLED SUBSTANCE THAT HE ALLEGEDLY POSSESSED**

25      First, the indictment should be dismissed because sections 841 and 960 of title 21 are facially

26 unconstitutional as they require a judge, rather than a jury, to determine the weight and quantity of drug

27 involved, which in turn determines the maximum (and minimum mandatory) sentence.  Second, if the Court

28 disagrees with this, the government must establish *mens rea* (*i.e.*, knowingly) with respect to drug type and

quantity. Given this, the indictment must be dismissed because the government likely failed to instruct the grand jury accordingly. Mr. Barajas-Cruz requests that the Court compel production of the grand jury transcripts, pursuant to Rule 6(e)(3)(C)(ii), with respect to this motion.

**III.**
**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF _NAVARRO-VARGAS_ AND _WILLIAMS_ AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. BARAJAS-CRUZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury. See CR at 7.[1] That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

---

[1] "CR" refers to the Clerk's Record in Case Number 07cr1905-H.

[2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Barajas-Cruz requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

1    After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

2    responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from

3    judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

4    federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See

5    id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

6    that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

7    though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

8    be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

9    because the grand jurors disagree with a proposed prosecution.

10    Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

11    to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

12        I've gone over this with a couple of people.  You understood from the questions and answers
         that a couple of people were excused, I think three in this case, because they could not adhere
13        to the principle that I'm about to tell you.

14    Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

15    disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

16    view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

17    Examination of the recently disclosed voir dire transcript, which contains additional instructions and

18    commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

19    reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

20    and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

21    merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his

22    earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

23    determination.

24        [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
         crime was committed?  And second, do we have a reasonable belief that the person that they
25        propose that we indict committed the crime?"

26

27

28        [4]  See also id. at 20 ("You're all about probable cause.").

3                                                    08CR0019-LAB

1    > If the answer is "yes" to both of those, then the case should move forward.  If the answer to
2    > either of the questions is "no," then the grand jury should not hesitate and not indict.

3   See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

4   term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

5   addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

6   committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

7   crime."

8        Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

9   in some unknown set of circumstances, they might decline to indict even where there was probable cause.

10  Because of the redactions of the grand jurors' names, Mr. Barajas-Cruz will refer to them by occupation.

11  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter

12  REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug

13  prosecutions were not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain

14  unspecified immigration cases.  See id.

15       Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

16  CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in

17  this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

18  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

19  simply not capable of expression in the context of grand jury service.

20   > Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the
     > defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
21   > appraisal of the evidence of the case that's in front of you, so, too, is the United States
     > entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I*
22   > *wouldn't want you to say,* "well, yeah, there's probable cause, but I still don't like what our
     > government is doing.  I disagree with these laws, so I'm not going to vote for it to go
23   > forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell
     > me that.
24

25  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

26  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

27  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

28  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

1  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

2  a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question

3  provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of

4  a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any

5  grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns

6  would permit them to vote "no bill" in the face of a showing probable cause.

7         Just in case there may have been a grand juror that did not understand his or her inability to exercise

8  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

9  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

10  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

11  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

12  considerations into account.

13         Well, those things -- the consequences of your determination shouldn't concern you in the
       sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
14     cannot consider the punishment or the consequence that Congress has set for these things.
       We'd ask you to also abide by that.  We want you to make a business-like decision of whether
15     there was a probable cause. . . .

16  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

17  went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

18         In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

19  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

20  juror is obligated to vote to indict if there is probable cause.

21         I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
       I have to make.  But my alternative is to vote for someone different, vote for someone that
22     supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
       like it.  So I'm not going to follow it here."
23
       You'd have a similar obligation as a grand juror even though you might have to grit your
24     teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against,
       for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
25     criminalizing some drugs.

26     That's not what your prerogative is here.  You're prerogative instead is to act like a judge and
       say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a crime
27     was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And then
       your obligation, if you find those to be true, would be to vote in favor of the case going
28     forward.*

1  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if

2  both questions are answered in the affirmative, lead to an "obligation" to indict.

3      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

4  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

5  to indict in every case in which there was probable cause.

6      The Court: Do you think you'd be inclined to let people go in drug cases even though you
       were convinced there was probable cause they committed a drug offense?
7      REA: It would depend on the case.
       The Court: Is there a chance that you would do that?
8      REA: Yes.
       The Court: I appreciate your answers.  I'll excuse you at this time.
9

10  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

11  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

12  should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

13  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

14  Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA

15  to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to

16  indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

17  forward."[5]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

18  was too great a risk to run.

19      **2.      The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
              Exculpatory Evidence.**
20

21      In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

22  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

    Ex. A at 20.
23

24  _____

        [5]  This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge
25  will have determined the existence of probable cause "in most circumstances" before it has been
    presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable
26  cause in each case because had a magistrate judge not so found, the case likely would not have been
    presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was
27  redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury
    more inclined to indict irrespective of the evidence presented.
28

1   Now, again, this emphasizes the difference between the function of the grand jury and the
2   trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
3   *duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*
4

5   Id. (emphasis added).

6         The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that

7   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

8   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something

9   adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.

10  Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

11  that was "adverse" or "that cuts against the charge."  See id.

12  **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
13  **During Impanelment.**

14        The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15  grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

16  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17  approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

18  the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

19  jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

20  2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

21  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable

22  to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

23  States v. Williams, 504 U.S. 36, 49 (1992).

24

25

26        [6]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority
27  because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional
28  independence.").

1    For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

2   II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

3   deciding whether a particular prosecution shall be instituted or followed up, performs much the same

4   function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

5   510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

6   I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

7   prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

8   the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

9   but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

10  by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

11  Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

12  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

13  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

14  Procedure § 15.2(g) (2d ed. 1999)).

15    Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

16  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

17    The grand jury thus determines not only whether probable cause exists, but also whether to
      "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
18    most significant of all, a capital offense or a non-capital offense -- all on the basis of the
      same facts.  And, significantly, the grand jury may refuse to return an indictment even
19    "'where a conviction can be obtained.'"

20  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

21  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

22  not only the initial decision to indict, but also significant questions such as how many counts to charge and

23  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

24  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

25  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

26  to indict someone even when the prosecutor has established probable cause that this individual has

27  committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

28  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

1    (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

2    Ninth Circuit.  But not in Judge Burns's instructions.

3    **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
          in Both _Vasquez_ and _Navarro-Vargas II._**

4

5         The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

6    jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

7    decision in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon

8    every finding of probable cause because the term "should" may mean "what is probable or expected."  299

9    F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

10   Hawkins ably pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

11   instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

12   obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  <u>See</u>

13   <u>also</u> <u>id.</u> ("The 'word' should is used to express a duty [or] obligation.") (quoting <u>The Oxford American</u>

14   <u>Diction and Language Guide</u> 1579 (1999) (brackets in original)).

15        The debate about what the word "should" means is irrelevant here; the instructions here make no

16   such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

17   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

18   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

19   indicting even though I think that the evidence is sufficient'...."  <u>See</u> Ex. A at 8-9.  Thus, the instruction flatly

20   bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand

21   juror would read this language as instructing, or even allowing, him or her to assess "the need to indict."

22   <u>Vasquez</u>, 474 U.S. at 264.

23        While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

24   an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, n context, it is clear that he could

25   only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns

26   not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

27   probable cause, "then the grand jury should hesitate and not indict."  <u>See</u> <u>id.</u> at 8.  At least in context, it

28   would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for

1  the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.

2  Clearly he was not.

3       The full passage cited above effectively eliminates any possibility that Judge Burns intended the

4  Navarro-Vargas spin on the word "should."

> 5  [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
> crime was committed?  And second, do we have a reasonable belief that the person that they
> 6  propose that we indict committed the crime?"
>
> 7  If the answer is "yes" to both of those, then the case should move forward.  If the answer to
> either of the questions is "no," then the grand jury should not hesitate and not indict.
>
> 8

9  See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states

10  that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to

11  "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408

12  F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

13  protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

14  "responsibilities continue to include both the determination whether there is probable cause and the

15  protection of citizens against unfounded criminal prosecutions.") (citation omitted).

16       By the same token, if Judge Burns said that "the case should move forward" if there is probable

17  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

18  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

19  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

20  been his intent.  But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are not

21  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

22  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

23  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

24

25

26       [7] This argument does not turn on Mr. Barajas-Cruz's view that the Navarro-Vargas/Marcucci reading

27  of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in
   which the word is employed by Judge Burns in his unique instructions, context which eliminates the

28  Navarro-Vargas/Marcucci reading as a possibility.

1    Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

2   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

3        **(1)**      The first occasion occurred in the following exchange when Judge Burns conducted voir dire

4   and excused a potential juror (CSW):

5       The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
        you to say, "Well, yeah, there's probable cause.  But I still don't like what the government is
6       doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your
        frame of mind, then probably you shouldn't serve.  Only you can tell me that.
7       Prospective Juror: Well, I think I may fall in that category.
        The Court: In the latter category?
8       Prospective Juror: Yes.
        The Court: Where it would be difficult for you to support a charge even if you thought the
9       evidence warranted it?
        Prospective Juror: Yes.
10      The Court: I'm going to excuse you then.

11  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

12  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

13  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

14  wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

15  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

16  the exercise of discretion by any other prospective grand juror.

17       **(2)**      In an even more explicit example of what "should" meant, Judge Burns makes clear that it

18  there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

19  Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

20      You'd have a similar *obligation* as a grand juror even though you might have to grit your
        teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against,
21      for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
        criminalizing some drugs.
22
        That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to
23      say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a
        crime was committed?  Yes.  Does it seem to me that this person's involved? It does."  *And
24      then your obligation, if you find those things to be true, would be to vote in favor of the case
        going forward.*
25

26  Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

27  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

28  were convinced there was probable cause they committed a drug offense?"  Id. at 27.  The potential juror

1  responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this

2  context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the

3  juror has no prerogative to do anything other than indict if there is probable cause.

4       Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

5  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

6  rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

7  indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

8  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

9  scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled

10  the prospective jurors, because his message is that there is no discretion not to indict.

11       **(3)**     As if the preceding examples were not enough, Judge Burns continued to pound the point

12  home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

13  on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

14  here."  See id. at 61.

15       **(4)**     And then again, after swearing in all the grand jurors who had already agreed to indict in

16  every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

17  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

18  that the evidence is sufficient . . . .  Instead your *obligation* is . . . not to bring your personal definition of

19  what the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

20       Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

21  penalties to which indicted persons may be subject.

22       Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
      about because there is a disparity between state and federal law.

23       The Court:  In what regard?
      Prospective Juror: Specifically, medical marijuana.

24       The Court:  Well, those things -- the consequences of your determination shouldn't concern
      you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*

25       *that they cannot consider the punishment or the consequence that Congress has set for these*
      *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision

26       of whether there was a probable cause. ...

27  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

28  would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

1  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

2  decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

3  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

4  independent." Id. at 1202 (emphases in the original).

5      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

6  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

7  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The

8  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

9  making a probable cause determination ... unconstitutionally undermines the very structural protections that

10 the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

11 that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

12 "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

13 in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors

14 erroneous instructions because nothing will happen if they disobey them." Id.

15     In setting forth Judge Hawkins' views, Mr. Barajas-Cruz understands that this Court may not adopt

16 them solely because the reasoning that supports them is so much more persuasive than the majority's

17 sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

18     Here, again, the question is not an obscure interpretation of the word "should", especially in light of

19 the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

20 Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

21 the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

22 and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

23     Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

24 they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment

25 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

26 Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot

27 embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

28 conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

1    grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

2    of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

3    1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

4    their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

5    here, Judge Burns has both fashioned his own rules and enforced them.

6    **D.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present**
     **Exculpatory Evidence to the Grand Jury.**

7

8    In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

9    argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

10   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

11   common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

12   judicial authority exists."  <u>See id.</u> at 47.  Indeed, although the supervisory power may provide the authority

13   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

14   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

15   Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

16   does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  <u>Id.</u>

17   at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

18   initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

19   claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See id.</u> at 51-55.

20   Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

21   present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

22       Now, again, this emphasizes the difference between the function of the grand jury and the
         trial jury.  You're all about probable cause.  If you think that there's evidence out there that
23       might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
         to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*
24       *bound to present evidence that cuts against what they may be asking you to do if they're*
         *aware of that evidence.*

25

26   <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

27   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

28   [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u>

1   id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  <u>See</u>

2   <u>Navarro-Vargas</u>, 408 F.3d at 1207.

3           This particular instruction has a devastating effect on the grand jury's protective powers, particularly

4   if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

5   conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Ex. A at 20.  Thus, once again,

6   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

7   probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

8   would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

9   should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

10  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

11  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

12  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

13  you to do if they're aware of that evidence."  <u>See</u> <u>id</u>.  Moreover, during voir dire, Judge Burns informed the

14  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

15  that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  <u>See</u> Ex. B at 14-15

16  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

17  the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

18  in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

19  to you."  <u>See</u> Ex. A at 27.

20          These instructions create a presumption that, in cases where the prosecutor does not present

21  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

22  exculpatory evidence was presented, would proceed along these lines:

23          (1)     I have to consider evidence that undercuts probable cause.

24          (2)     The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

25                  evidence to me, if it existed.

26          (3)     Because no such evidence was presented to me, I may conclude that there is none.

27

28

1   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

2   evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

3   bound prosecutor would have presented it.

4         The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

5   prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

6   probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

7   of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

8   the Fifth Amendment.

9                                               **IV.**

**MOTION TO PRESERVE AND INSPECT EVIDENCE**

10

11         Mr. Barajas-Cruz requests the preservation of all physical evidence in this case.  This includes any

12   evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the

13   government (or its private contractors) in this case.  See United States v. Riley, 189 F.3d 802, 806-808

14   (9th Cir.1999).  This request includes, but is not limited to: (1) the alleged contraband involved in the case,

15   including samples used to conduct tests; (2) the containers or packaging within which the contraband was

16   discovered; (3) the results of any fingerprint analysis; (4) the defendant's personal effects; (5) any videotapes

17   capturing Mr. Barajas-Cruz in this matter; (6) recorded communications made by the government related

18   to the above captioned case; (7) any evidence seized from the defendant or any third party; and, (8) the

19   vehicle seized at the port of entry driven by Mr. Barajas-Cruz.  Mr. Barajas-Cruz requests that government

20   counsel be ordered to notify the agencies and private contractors with custody of such evidence be informed

21   of the Court's preservation order.

22         Further, Mr. Barajas-Cruz requests an order granting defense counsel and/or their investigators access

23   to the alleged contraband and other evidence for the purposes of investigation, including inspection,

24   photographing, and re-weighing of the alleged contraband if necessary. Fed. R. Crim. P. 16(a)(1)(C).  A

25   proposed Order is attached for the convenience of the Court.

26         Mr. Barajas-Cruz requests that the alleged contraband be preserved until inspection and weighing

27   by the defense is complete and that the remainder of the evidence in the case be preserved throughout the

28   pendency of the case, including any appeals.

# V.
## MOTION TO COMPEL DISCOVERY

Mr. Barajas-Cruz moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir.), cert. denied, 493 U.S. 858 (1989).

(1) The Defendant's Statements. The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

(2) Arrest Reports, Notes and Dispatch Tapes. The defendant also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. See Fed. R. Crim. P. 16(a)(1)(B) and (c), Fed. R. Crim. P. 26.2 and 12(I).

(3) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the Government's case. Under Brady, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

1  (4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The Government

2 must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request includes any

3 cooperation or attempted cooperation by the defendant as well as any information that could affect any base

4 offense level or specific offense characteristic under Chapter Two of the Guidelines.  The defendant also

5 requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal

6 history, and information relevant to any other application of the Guidelines.

7  (5) <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of his prior record. Fed. R.

8 Crim. P. 16(a)(1)(B).

9  (6) <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts

10 under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Rule 404(b), "upon

11 request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

12 general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.

13 The defendant requests that such notice be given three (3) weeks before trial in order to give the defense time

14 to adequately investigate and prepare for trial.

15  (7) <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any search,

16 either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(c).

17  (8) <u>Tangible Objects</u>.  The defendant requests the opportunity to inspect and copy as well as test, if

18 necessary, all other documents and tangible objects, including photographs, books, papers, documents,

19 fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended

20 for use in the Government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim.

21 P. 16(a)(2)(c).

22  (9) <u>Evidence of Bias or Motive to Lie</u>.  The defendant requests any evidence that any prospective

23 Government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his

24 or his testimony.

25  (10) <u>Impeachment Evidence</u>.  The defendant requests any evidence that any prospective Government

26 witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness

27 has made a statement favorable to the defendant.  <u>See</u> Fed R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>,

28 <u>supra</u>.

1    (11) <u>Evidence of Criminal Investigation of Any Government Witness</u>.  The defendant requests any

2 evidence that any prospective witness is under investigation by federal, state or local authorities for any

3 criminal conduct.

4    (12) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>.  The

5 defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

6 that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

7 any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

8 alcoholic.

9    (13) <u>Witness Addresses</u>.  The defendant requests the name and last known address of each

10 prospective Government witness.  The defendant also requests the name and last known address of every

11 witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will

12 not be called as a Government witness.

13    (14) <u>Name of Witnesses Favorable to the Defendant</u>.  The defendant requests the name of any

14 witness who made an arguably favorable statement concerning the defendant or who could not identify him

15 who was unsure of his identity, or participation in the crime charged.

16    (15) <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement

17 relevant to any possible defense or contention that he might assert.

18    (16) <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all material,

19 including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500.

20 Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks

21 material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness'

22 interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  <u>Campbell v.</u>

23 <u>United States</u>, 373 U.S. 487, 490-92 (1963).  In <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) the

24 Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes

25 are then subject to the Jencks Act.

26    (17) <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

27 requests all statements and/or promises, express or implied, made to any Government witnesses, in exchange

28

1  for their testimony in this case, and all other information which could arguably be used for the impeachment

2  of any Government witnesses.

3      (18)  <u>Agreements Between the Government and Witnesses</u>.  The defendant requests discovery

4  regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future

5  compensation, or any other kind of agreement or understanding, including any implicit understanding

6  relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government

7  witness and the Government (federal, state and/or local).  This request also includes any discussion with a

8  potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain,

9  even if no bargain was made, or the advice not followed.

10     (19)  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the names and

11 addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

12 disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

13 charged against Mr. Barajas-Cruz.  The Government must disclose the informant's identity and location, as

14 well as disclose the existence of any other percipient witness unknown or unknowable to the defense.

15 <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957).  The Government must disclose any information

16 derived from informants which exculpates or tends to exculpate the defendant.

17     (20)  <u>Bias by Informants or Cooperating Witnesses</u>.  The defendant requests disclosure of any

18 information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>, 405

19 U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats

20 were made to the witness to secure cooperation with the authorities.

21     (21)  <u>Government Examination of Law Enforcement Personnel Files</u>. Mr. Barajas-Cruz requests that

22 the Government examine the personnel files and any other files within its custody, care or control, or which

23 could be obtained by the government, for all testifying witnesses, including testifying officers.

24 Mr. Maldonado-Perez requests that these files be reviewed by the Government attorney for evidence of

25 perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any

26 information that is exculpatory, pursuant to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir.

27 1991).  The obligation to examine files arises by virtue of the defense making a demand for their review:

28 the Ninth Circuit in <u>Henthorn</u> remanded for <u>in camera</u> review of the agents' files because the government

1  failed to examine the files of agents who testified at trial. This Court should therefore order the Government

2  to review all such files for all testifying witnesses and turn over any material relevant to impeachment or that

3  is exculpatory to Mr. Barajas-Cruz prior to trial. Mr. Barajas-Cruz specifically requests that the prosecutor,

4  not the law enforcement officers, review the files in this case. The duty to review the files, under <u>Henthorn</u>,

5  should be the prosecutor's. Only the prosecutor has the legal knowledge and ethical obligations to fully

6  comply with this request.

7    (22)  <u>Expert Summaries</u>. Defendant requests written summaries of all expert testimony that the

8  government intends to present under Federal Rules of Evidence 702, 703 or 705 during its case in chief,

9  written summaries of the bases for each expert's opinion, and written summaries of the experts'

10  qualifications. Fed. R. Crim. P. 16(a)(1)(E). This request includes, but is not limited to, fingerprint expert

11  testimony.

12    (23)  <u>Reports of Scientific Tests or Examinations</u>. Pursuant to Fed. R. Crim. P. 16(a)(1)(F),

13  Mr. Beltran requests disclosure and the opportunity to inspect, copy, and photograph the results and reports

14  of all tests, examinations, and experiments conducted upon the evidence in this case, including, but not

15  limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession,

16  custody, or control of the government, the existence of which is known, or by the exercise of due diligence

17  may become known, to the attorney for the government, and that are material to the preparation of the

18  defense or are intended for use by the government as evidence in chief at the trial.

19    (24)  <u>Residual Request</u>. Mr. Barajas-Cruz intends by this discovery motion to invoke his rights to

20  discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

21  and laws of the United States. This request specifically includes all subsections of Rule 16. Mr. Barajas-

22  Cruz requests that the Government provide him and his attorney with the above requested material

23  sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

24                                 **VI.**
   **THE COURT SHOULD SUPPRESS MR. BARAJAS-CRUZ'S ALLEGED STATEMENTS**

25

26  **A.  _Miranda_ Warnings Must Precede Custodial Interrogation.**

27    The Supreme Court has held that the government may <u>not</u> use statements, whether exculpatory or

28  inculpatory, obtained during custodial interrogation of the defendant unless it demonstrates the use of

                                    22                          08CR0019-LAB

1    procedural safeguards effective to secure the privilege against self-incrimination.  Miranda v. Arizona, 384

2    U.S. 436, 444 (1966).  The law imposes no substantive duty upon the accused to make any showing other

3    than that the statements were taken while the accused was in custody and subject to interrogation.  Id. at 476.

4    Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken

5    into custody or otherwise deprived of her freedom of action in any significant way.  Id. at 477; see also

6    Orozco v. Texas, 394 U.S. 324, 327 (1969).  In Stansbury v. California, 511 U.S. 318 (1994), the Supreme

7    Court stated that "the initial determination of custody depends on the objective circumstances of the

8    interrogation, not on the subjective views harbored by either the interrogating officers or the person being

9    questioned."  Id. at 323.

10        When it takes an accused's statement during custodial interrogation, a heavy burden rests on the

11   government to demonstrate that the accused intelligently and voluntarily waived her privilege against self-

12   incrimination.  To satisfy this burden, the prosecution must introduce evidence sufficient to establish "that

13   under the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned

14   and the consequences of the decision to abandon it."  United States v. Garibay, 143 F.3d 534, 536 (9th Cir.

15   1998) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). The Ninth Circuit has stated that "[t]here is

16   a presumption against waiver."  Garibay, 143 F.3d at 536.  The standard of proof for a waiver of

17   constitutional rights is high.  Miranda, 384 U.S. at 475; see also United States v. Heldt, 745 F.2d 1275, 1277

18   (9th Cir. 1984) (the burden on the government is great, the court must indulge every reasonable presumption

19   against waiver of fundamental constitutional rights) (citing Johnson v. Zerbst, 304 US 458, 464 (1938)).

20   Finally, it should be noted that, since Miranda rests on a constitutional foundation, see Dickerson v. United

21   States, 530 U.S. 428, 438 (2000), no law or local court rule relieves the government of its burden to prove

22   that Mr. Barajas-Cruz voluntarily waived the Miranda protections.  Miranda, 384 U.S. at 475.

23        The validity of the waiver depends upon the particular facts and circumstances of the case, and

24   include the background, experience, and conduct of the accused.  Edwards v. Arizona, 451 U.S. 477, 482

25   (1981); Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see also Garibay, 143 F.3d at 536; United States v.

26   Bernard S., 795 F.2d at 751 ("a valid waiver of Miranda rights depends upon the totality of the

27   circumstances, including the background, experience and conduct of the accused").  In Derrick v. Peterson,

28   924 F.2d 813 (9th Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a Miranda waiver

1  requires a two prong analysis: the waiver must be both (1) voluntary; and, (2) knowing and intelligent.  Id.

2  at 820.  The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry [under] the [Fifth]

3  Amendment . . . ."  Id.  The knowledge prong mandates an inquiry into whether "the waiver [was] made with

4  a full awareness both of the nature of the right being abandoned and the consequences of the decision to

5  abandon it."  Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)); accord Garibay, 143 F.3d at 436.

6  Thus, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced

7  choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have

8  been waived."  Derrick at 820 (quoting Moran v. Burbine, 475 U.S. at 521) (emphasis in original) (citations

9  omitted)).

10      Here, Mr. Barajas-Cruz was in custody upon being escorted to the secondary inspection area.  Unless

11  and until it shows the agents properly administered the Miranda warnings and obtained a knowing and

12  intelligent waiver from Mr. Barajas-Cruz, the government cannot use evidence obtained as a result of any

13  custodial interrogation that occurred after Mr. Barajas-Cruz's arrest.  Miranda, 384 U.S. at 479.

14  **B.    The Government Bears the Burden of Proving that Mr. Barajas-Cruz's Alleged**
15  **       Statements Were Made Voluntarily**

16      Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case

17  is deprived of due process of law if his conviction is founded upon an involuntary confession.  Arizona v.

18  Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964).  The government bears the

19  burden of proving that a confession is voluntary.  Lego v. Twomey, 404 U.S. 477, 483 (1972).

20      In order to be voluntary, a statement must be the product of a rational intellect and free will.

21  Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne

22  in a particular case, this Court must consider the totality of the circumstances.  Schneckloth at 226; see also

23  United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993).  A statement is  involuntary if it is

24  "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight,

25  [or] by the exertion of any improper influence."  Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v.

26  United States, 168 U.S. 532, 542-43 (1897)); see also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

27  1981).

28

1   To meet its burden, the government must demonstrate that Mr. Barajas-Cruz's statement was <u>not</u> the

2   result of either threats or promises made by the agents, but was made voluntarily.

3   **C.   This Court Must Conduct An Evidentiary Hearing.**

4   Accordingly, this Court must conduct an evidentiary hearing to determine whether the government

5   can meet this burden and use Mr. Barajas-Cruz's statements against him.  18 U.S.C. § 3501.  Since

6   "'suppression hearings are often as important as the trial itself,'" these findings should be supported by

7   evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive

8   pleading.  <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 609-10 (9th Cir. 1990) (quoting <u>Waller v.</u>

9   <u>Georgia</u>, 467 U.S. 39, 46 (1984)).

10   Unless and until the government demonstrates that statements were made voluntarily, the statements

11   may <u>not</u> be used <u>for any purpose</u> at trial.

12   **VII.**

13   **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

14   Defense counsel requests leave to file further motions and notices of defense based upon information

15   gained in the discovery process.  To date, counsel has not received any discovery from the government in

16   this matter.

17   **VIII.**

18   **CONCLUSION**

19   For these and all the foregoing reasons, the defendant, Mr. Barajas-Cruz, respectfully requests that

20   this court grant his motions and grant any and all other relief deemed proper and fair.

21   Respectfully submitted,

22

23   _____   *s/ Jodi Denise Thorp*
     DATED: January 15, 2008           Jodi Denise Thorp
24                                      Attorneys for Mr. Barajas-Cruz
                                        E-mail:  jodithorp@thorplawoffice.com
25

26

27

28

                              25                    08CR0019-LAB